# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| ROCHELLE D. PERKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:12-CV-1466 CAS |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying Rochelle Perkins' application for disability insurance benefits under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. Perkins alleges disability due to manic depression, paranoia, hearing voices, arthritis in the neck and shoulder, and infringed nerve in the right shoulder or nerve. [Tr. 117].

## I.       Procedural History

Perkins completed her applications for disability insurance benefits and SSI on May 24, 2007. (Tr. 100-110.) The Social Security Administration ("SSA") denied Perkins' claim and she timely filed a request for hearing before an Administrative Law Judge ("ALJ"). (Tr. 44-53.) The SSA granted Perkins' request and a hearing was held on June 16, 2009. (Tr. 15-37, 55-59.) The ALJ issued a decision upholding the denial of benefits on September 1, 2009. (Tr. 8-14.)

---

[1] At the time this case was filed, Michael J. Astrue was the Commissioner of Social Security. Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party. Fed. R. Civ. P. 25(d). Later proceedings should be in the substituted party's name and the Court may order substitution at any time. *Id.* The Court will order the Clerk of Court to substitute Carolyn W. Colvin for Michael J. Astrue in this matter.

Perkins requested review of the ALJ's decision by the Appeals Council. (Tr. 4.) On February 4, 2010, the Appeals Council denied Perkins' request for review. (Tr. 1-3.) Perkins appealed to the United States District Court in *Perkins v. Astrue*, 4:10-CV-581 LMB. On September 20, 2011, The District Court issued a judgment reversing and remanding the case, because the ALJ failed to properly weigh the medical opinions, failed to develop the record, and the residual functional capacity ("RFC") was not based on substantial evidence in the record. (Tr. 445-475.)

Upon remand, the ALJ held a supplemental hearing on May 7, 2012. (Tr. 414-443.) The ALJ issued another decision upholding the denial of benefits on June 28, 2012. (Tr. 363-376.) Thus, the decision of the ALJ was the final decision of the Commissioner. 20 C.F.R. § 404.984(a) (when a case is remanded by a Federal court for further consideration, the decision of the ALJ will become the final decision of the Commissioner after remand unless the Appeals Council assumes jurisdiction of the case.) Perkins filed this appeal and Brief in Support of Complaint on August 16, 2012. [Doc. 1, 15.] The Commissioner filed an Answer and Brief in Support of Answer. [Doc. 9, 20.]

## II.     Decision of the ALJ

The ALJ determined that Perkins met the insured status requirements of the Social Security Act, through December 31, 2009 and had not engaged in substantial gainful activity since the alleged onset date of December 1, 2004. (Tr. 365.) She found that Perkins had the severe impairments of chronic neck and shoulder pain and depression. (Tr. 365.) The ALJ also determined that Perkins did not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 366-67.) The ALJ found that Perkins had the RFC to perform the full range of light work as defined in 20 C.F.R. §§ 404.1567(b), 416.976(b), except she can only frequently stoop, kneel,

crouch, and crawl; and only occasionally push and pull with the arms. (Tr. 367.) The ALJ concluded that Perkins is capable of performing her past relevant work as office assistant and she has not been under a disability, as defined in the Social Security Act, from December 1, 2004 through the date of the decision. (Tr. 374-75.)

## III.    Administrative Record

The relevant evidence before the ALJ is as follows:

### A.    Hearing Testimony[2]

At the first administrative hearing, Perkins testified. At the second administrative hearing, Perkins and vocational expert Delores Gonzalez testified.

#### 1.    Perkins' Testimony

Perkins testified that she attended college through her junior year. (Tr. 18.) During the last fifteen years, Perkins worked as a file clerk, administrative assistant and in customer service. (Tr. 21.) Perkins went to jail twice in May 2002 for passing bad checks. (Tr. 20.) Her most recent job was from January to March 2009 when she worked between five to seven hours a week in a work study job. (Tr. 22.) At the time of the first hearing, Perkins was pursuing a bachelor's degree in business. (Tr. 22.) Perkins did not seek help from disability services at her school. (Tr. 35.) Perkins stopped taking classes in 2009. (Tr. 418.)

Perkins started taking classes, because she was depressed and she received threats that her probation would be revoked if she did not get a job or attend school. (Tr. 24-25.) Perkins has been working at Check-and-Go in 2004 processing payday loans, but it was too much pressure. (Tr. 25-26.) Perkins was responsible for a lot of money there and she was always scared that if money became missing, she would be locked up again. (Tr. 26.) The job also

---

[2] The ALJ initially scheduled Perkins' hearing for November 8, 2007. (Tr. 38-43.) At the hearing, the ALJ gave Perkins an extension of time to obtain a lawyer. (Tr. 41.)

required that she be locked in the building and she could not leave the premises during the work day. (Tr. 25-26.) Perkins' depression caused a lack of concentration and no desire to engage socially. (Tr. 26-27.) At the time of the hearing, Perkins still experienced problems with concentration and either sleeping for days or not being able to sleep at all. (Tr. 27.)

Perkins testified that she has never seen a psychiatrist or psychologist. (Tr. 27, 430.) Perkins was referred to one, but the doctor was too far away and she did not have adequate transportation. (Tr. 27.) Additionally, there was no doctor in her area that would accept her insurance. (Tr. 27-28, 430.) She had seen a counselor at her school. (Tr. 28, 430-31.) Perkins' primary care physician, Dr. Hossfeld diagnosed her with depression and anxiety. (Tr. 431.) Dr. Hossfeld prescribed Lexapro and Xanax for anxiety and depression. (Tr. 429-430.) Perkins stated she still suffers symptoms from depression, including sleepiness and hopelessness. (Tr. 431.) She has thoughts of hurting herself and was hospitalized for ten days in the early 1990's. (Tr. 431-32.) Perkins is very emotional about her physical condition and has crying spells once or twice a week lasting between 10 and 15 minutes. (Tr. 432.)

Perkins had complications working as a file clerk, because she would become light-headed and dizzy from bending down and being on her feet too long. (Tr. 22.) She also has problems with her arms and right hand due to reaching and pulling files. (Tr. 22, 32.) Although the files were thin, she had problems grasping and gripping. (Tr. 23.) Perkins stated she has difficulty grasping hair brushes, dishes, and cans. (Tr. 29.) Perkins drops things unexpectedly and drops heavy things. (Tr. 30, 428.) She can pick up small change, but has problems with buttons and safety pins. (Tr. 29.) Perkins initially testified that she can comfortably lift fifteen pounds for five minutes maximum and the most she can lift is 25 pounds. (Tr. 29-30.) At the second hearing, Perkins stated she can lift and carry 10 pounds comfortably. (Tr. 428.) She can

walk a block with comfort, before her legs and feet start to burn and she feels pulling. (Tr. 30, 32, 426.) Perkins can sit for thirty minutes and then she has to take a break to stretch her legs, including during her classes. (Tr. 30, 426-27.). Perkins reported the need to shift and move around after thirty minutes to Dr. Cotter and he put her on an exercise regimen and she is currently using it daily. (Tr. 327.) Perkins can stand for 30 minutes to an hour before she has to move around or sit down. (Tr. 428.)

Perkins stated that calluses on her feet also make her unstable when walking or standing for too long, any time longer than 15-20 minutes. (Tr. 23.) She has to take breaks occasionally to keep from getting light-headed. (Tr. 23-24.) Perkins testified that her doctors told her that she has arthritis in her neck and back and torn muscle tissue in her upper right shoulder. (Tr. 32.) She experiences tingling in her left hand, but her problems with her left arm and hand are not as intense as on her right side. (Tr. 32.)

At the first hearing, Perkins testified that she received injections in her upper right shoulder every three months and takes a lot of pain medication to treat her neck and back problems. (Tr. 33.) Perkins' doctors have not recommended surgery, because they want to determine if the tear will heal on its own. (Tr. 33.) At the second hearing, Perkins testified that her condition had worsened. (Tr. 420.) Perkins stated that her doctor had increased the amount of cortisone injections for her shoulder and back and her hands were numb due to a narrowing of the blood flow from the bones in her neck and upper back. (Tr. 421.) Perkins also stated that she had neck pain daily. (Tr. 421.) She takes pain medication or muscle relaxers, which helps a lot but the pain never goes away. (Tr. 421.) The pain medication makes her really drowsy and she has to rest. (Tr. 421-422.) Perkins testified that the pain would interfere with her ability to work, because her pain medication causes drowsiness, which leads to her being unable to stay

focused and concentrate. (Tr. 422.) Perkins stated she also has pain at the top of her head that goes down her back. (Tr. 422.)

Perkins stated she has right shoulder pain that started in 2005 or 2006. (Tr. 423.) Dr. Van Ryan and Dr. Cotter recommended surgery for her right shoulder, but her insurance will not cover it. (Tr. 423.) Therefore, she receives trigger point shots in her upper shoulders and lower back to treat her shoulder. (Tr. 423.) The trigger point shots help the pain for three to four months. (Tr. 424.) Doctors have recommended she receive epidural procedures in her neck. (Tr. 424.) Perkins also testified that she has a torn ligament in her right knee that causes pain and prevents her from going down stairs regularly. (Tr. 424.) Perkins weighs 239 pounds and her normal weight was 180 pounds. (Tr. 425.) Perkins testified that she could no longer exercise, walk, or climb stairs regularly. (Tr. 425.) Dr. Tull[3] stated that she needed to have surgery on her knee and she was going to have it. (Tr. 428.)

Perkins testified that she mostly microwaves food, because she has dropped food while preparing it. (Tr. 34.) Perkins cares for her two daughters ages 8 and 9 at the time of the first hearing, but she just makes sure that they get up and are prepared for school. (Tr. 33-34.) Her daughters help cook and help her comb her hair. (Tr. 34.)

At the first administrative hearing, Perkins stated that the side effects from her medication include lots of diarrhea, crying spells, and sleeping a lot. (Tr. 35.) She sleeps half the day when the pain is extensive, which is approximately six days out of the month. (Tr. 35-36.) Perkins has diarrhea twice in the morning, seven or eight times out of the month and crying spells once or twice every other day. (Tr. 36.) Perkins smokes 10 cigarettes a day. (Tr. 36.)

---

[3] The transcript indicates a reference to Dr. Toe. (Tr. 428.) Perkins' medical records indicate that she was likely referring to Dr. Tull who treated her knee problems. (Tr. 635.)

### 2. VE Testimony

VE Gonzalez testified that Perkins' previous work experience as a customer service representative and telemarketer were sedentary, unskilled positions. (Tr. 436.) Perkins' work as an ice cream truck driver was medium, semi-skilled work. (Tr. 436.) Perkins' work as a cashier was light, semi-skilled work and her work as an office assistant was light, unskilled work. (Tr. 436.) The VE stated that if Perkins were functionally limited to light, unskilled work, could frequently stoop, kneel, crouch, and crawl, and occasionally do pushing and pulling with her arms, she could return to her past work as an office assistant. (Tr. 437.) The VE testified that Perkins could also perform the jobs of order caller, furniture rental consultant, or information clerk. (Tr. 437.)

If Perkins' fine manipulation was limited to 25% bilaterally, reaching overhead limited to 10% of an eight hour day, and grasping limited to 25% of an eight hour day, the office assistant, information clerk, and job caller positions would be precluded. (Tr. 438.) The additional limitations of sitting four hours in an eight hour day, standing and walking two hours in an eight hour day would preclude any of the jobs named by the VE. (Tr. 439.) The VE testified that to perform the jobs she listed, a person would need to be on task for at least 2 hours before taking a short 10 to 15 minute break halfway through the morning and then either a half hour or an hour for lunch, and then in the afternoon for another 10 to 15 minute break. (Tr. 439.) If a person's not on task during other times of the day, the person would need to be accommodated and could not work competitively. (Tr. 440.) A person who would need to take two or more days a month at the beginning of entry-level employment would not be able to maintain employment. (Tr. 440.)

## B.     Medical Evidence

The relevant medical evidence is as follows.

On November 17, 2006, Perkins visited People's Health Centers for neck and right upper limb pain.  (Tr. 215-16.)  On December 21, 2006, Perkins again visited People's Health Centers for right arm pain, foot numbness, shoulder and neck pain, and a bump on her belly.  (Tr. 218-219.)

An MRI of Perkins' cervical spine showed early diffuse spondylosis with indentation on the anterior aspect of the thecal sac at C3-C4, C6-C7 with indentation on the thecal sac and anterior aspect of the spinal cord at C4-C5 and C5-C6, narrowing sagittal measurement bony neural canal to 0.7 centimeters at the C4-C6 level, and right neural foraminal impingement at C3-C4 and C4-C5.  (Tr. 249-250.)

On March 6, 2007, Dr. Mollie Hossfeld treated Perkins for complaints of continued neck and right arm pain with numbness and tingling, left hand blisters, continued depression, and sore throat.  (Tr. 222-23.)  Dr. Hossfeld examined Perkins and found that Perkins had neck pain with active flexion and extension and decreased right shoulder range of motion due to pain.  (Tr. 222.)  Dr. Hossfeld diagnosed Perkins with cervical spine spondylosis with right sided foraminal narrowing, likely herpes zoster, depression and anxiety.  (Tr. 223.)  On March 9, 2007, a note from a podiatric evaluation indicated that Perkins had a marked limitation of ambulation.  (Tr. 224.)

On March 27, 2007, Perkins visited the emergency room and reported neck and right shoulder pain, which had lasted 2 to 3 weeks.  (Tr. 228.)  She was diagnosed as having neck pain and ordered to take Vicodin and Naproxen as already prescribed.  (Tr. 228.)

A MRI of Perkins' shoulder done on May 18, 2007 showed that an undersurface tear of the anterior and central fibers of the supraspinatus with full focal thickness tear of the posterior fibers of the supraspinatus and tendinopathy of supraspinatus and infraspinatus. (Tr. 248.)

On June 4, 2007, Perkins visited Dr. Hossfeld with continued neck and right arm pain with numbness and tingling, left hand blisters, continued depression, and pain with urination. (Tr. 252-54.) Perkins rated her pain level at 8 out 10, with 10 being the worst level. (Tr. 254.) She reported that her pain did not affect her sleeping and appetite, but decreased her physical activity. (Tr. 254.) Dr. Hossfeld diagnosed Perkins with cervical spine spondylosis with right sided foraminal narrowing, herpes Zoster, depression or anxiety, right sided supraspinatous tear, and urinary tract infection. (Tr. 252-53.) On July 23, 2007, Perkins visited the emergency room at St. Mary's Health Center complaining of neck and back pain and a swollen vein. (Tr. 276.) The doctor diagnosed her with depression and anxiety. (Tr. 279.)

Perkins visited Dr. Jacques VanRyn between July 2007 and January 2008. (Tr. 286-292.) On July 25, 2007, Dr. VanRyn examined Perkins and found she had full cervical range of motion. Dr. VanRyn noted that Perkins had neck and upper scapular pain with rotation to the right. (Tr. 291.) He noted that Perkins could flex and extend 70 degrees, with a bilateral rotation of 90 degrees and that Perkins' motor strength was grade 5 in all major groups. (Tr. 291.) Dr. VanRyn determined that Perkins had cervical radiculopathy and right shoulder impingement. (Tr. 292.) He advised Perkins to continue with her current pain management, which consisted of taking Tylenol and he instructed her how to do isometric exercises. (Tr. 291-92.) Perkins reported significant improvement with her pain in August and November 2007. (Tr. 288, 290.) She complained of increased pain in October and November 2007 and January 2008 due to aggravating her shoulder by carrying heavy books and typing a paper. (Tr. 286-87, 289.) The

physical examinations between July 2007 and 2008 showed the Perkins had full rage cervical range of motion (Tr. 288-292.)  She also had a 5 in upper extremity motor strength.  (Tr. 287-291.)  After her condition worsened, an x-Ray completed on November 28, 2007 showed loss of her lordotic curve on the lateral view as well as some spurring at the level of C3-C4.  (Tr. 287.)  The x-ray also showed mild posterior spurring at the level of 4-5, 5-6, and 6-7.  (Tr. 287.)  Dr. VanRyn diagnosed her with cervical radiculopathy not making progress.  (Tr. 286.)  He advised Perkins to purchase a home traction union and a new cervical pillow, as well as take Motrin and Skelaxin.  (Tr. 286.)

On August 3, 2007, Dr. Judith McGhee, psychologist completed a Psychiatric Review Technique for Perkins.  (Tr. 257-268.)  Dr. McGhee found that Perkins had depression and anxiety.  (Tr. 260-61.)  Dr. McGhee determined that Perkins had mild restrictions of activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace.  (Tr. 265.)  W. Hughes completed a Physical RFC on Perkins on the same date.  (Tr. 269-274.)  Hughes determined that Perkins had spondylosis and cervical strain.  (Tr. 269.)  Hughes found that Perkins did not have any visual, communicative, or environmental limitations.  (Tr. 272-73.)  Hughes opined that Perkins could lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk and sit for about six hours in an eight hour workday with unlimited pushing and/or pulling in accordance with lifting and carrying limitations.  (Tr. 270.)  Hughes also found that Perkins could only occasionally climb or balance and was limited in reaching in all directions.  (Tr. 272.)

On August 8, 2007, Dr. Robert Swarm evaluated Perkins for consultation regarding treatment recommendations for Perkins' persistent neck, right shoulder, and right upper extremity pain.  (Tr. 332- 33.)  Perkins reported that she had had persistent neck and upper

extremity pain since a car accident in June 2006. (Tr. 332.) Dr. Swarm noted that Perkins walked with a reasonably symmetric gait and had normal and symmetric upper and lower reflexes. (Tr. 332.) He also noted that her Spurling's maneuver was negative bilaterally and she had significant tenderness to palpation in right posterior shoulder musculature. (Tr. 332.) Dr. Swarm recommended that Perkins return to the Pain Center for cervical epidural steroid injections at C6-7 and physical therapy at the Rehabilitation Institute of St. Louis. (Tr. 333.)

Perkins visited Dr. Hossfeld in September and November 2007. (Tr. 281-284.) During those visits Perkins reported that pain in her neck and shoulder had significantly improved post injection to her shoulder. (Tr. 281, 283.) Perkins declined epidural injections due the dramatic improvement of pain. (Tr. 281, 283.) In September, Perkins also declined medication for her depression, however, at the November 2007 visit; Perkins requested a psychiatric referral and medication. (Tr. 281, 283.) Dr. Hossfeld continued to treat Perkins between January and July 2008. Dr. Hossfeld diagnosed Perkins with depression and anxiety, left shoulder pain, cervical radiculopathy, herpes [zoster], and chronic hair or head itch. (Tr. 294, 298, 303.) During those visits Perkins complained of increased pain in her left shoulder, which she described as severe. (297-302.) Perkins' pain level decreased however, from a 6 out of 10, with 10 being worst to 3 out of 10 by July 2008. (Tr. 293, 301.) On July 21, 2008, an MRI of Perkins' left shoulder showed that there was no rotator cuff tear and that the acrominoclavicular joint was normal. (Tr. 306.)

On October 1, 2008 Perkins visited the University Health Services for depression and anxiety treatment. (Tr. 352-53.) The provider opined that Perkins had post-traumatic stress disorder. (Tr. 353.)

On March 23, 2009, Perkins visited Dr. VanRyn and reported doing fairly well with her left shoulder, with a recent increase in pain. (Tr. 639.) Perkins reported that she had not been very good about doing her exercises. (Tr. 639.) Upon examination, Dr. Ryan found that Perkins had full range of motion of her shoulder and that her motor strength was grade 5 and equal. (Tr. 639.) Perkins' flexion and extension of the neck was 60 degrees, 65 degrees right and 70 degrees left. (Tr. 639.) Dr. VanRyn found a positive trigger point on the right side about the first rib area (Tr. 639.)

On June 6, 2009, Perkins visited DePaul Health Center with complaints of leg swelling and left chest pain. (Tr. 551.) Dr. Donte McClary determined that Perkins had a bilateral lower extremity edema, left chest pain, right knee pain, a urinary tract infection, and obesity. (Tr. 552.)

On June 17, 2009, Dr. Hossfeld completed a Physical Residual Functional Capacity Questionnaire for Perkins. (Tr. 354-359.) Dr. Hossfeld opined that Perkins had cervical spinal stenosis, shoulder osteoarthritis, major depressive disorder, and anxiety. (Tr. 354.) Dr. Hossfeld opined that Perkins' prognosis was good. (Tr. 354.) Dr. Hossfeld indicated that Perkins' impairments were expected to last at least twelve months and that Perkins was not a malingerer. (Tr. 355.) She further opined that Perkins' pain would constantly interfere with attention and concentration and that moderate stress was okay. (Tr. 356.) Dr. Hossfeld indicated that Perkins could walk 4 to 6 blocks without rest or severe pain; sit and stand more than two hours; needs 60 minutes to walk during an 8 hour workday and needs a job that permits shifting positions from sitting, standing, or walking. (Tr. 357.) Dr. Hossfeld opined that Perkins will need to take unscheduled breaks during the work day for 10 minutes. (Tr. 357.) Dr. Hossfeld noted that Perkins could frequently lift and carry less than 10 pounds and occasionally lift and carry up to

20 pounds. (Tr. 358.) Dr. Hossfeld estimated the Perkins would be absent from work about once a month due to her impairments or treatment. (Tr. 358.)

On June 24, 2009, Perkins visited Dr. Frank Tull complaining of pain in the trapezial area of her right neck and pain in her right knee. (Tr. 635.) Dr. Tull opined that the x-rays of Perkins' right knee were normal. (Tr. 635, 643.) Upon examination, Dr. Tull found that Perkins' shoulder had a painless range of motion with full cuff strength and positive Spurling's test. (Tr. 635.) Dr. Tull diagnosed Perkins with likely cervical radiculopathy on the right and referred her to Dr. Khader. (Tr. 635.) He also found that she had right knee pain of an unknown etiology. (Tr. 635.)

On July 7, 2009, Dr. Syed Abdul A. Khader examined Perkins who complained of considerable pain in the neck and right upper extremity. (Tr. 637-38.) Dr. Khader noted that Perkins' general examination is unremarkable. (Tr. 637.) Dr. Khader observed a normal gait pattern, normal heel and toe-walk, and normal tandem walk. (Tr. 637.) Dr. Khader found that Perkins' range of motion in her cervical spine was decreased in extension, lateral flexion, and lateral rotation in either direction with some discomfort in all planes and her Spurling's test was negative. (Tr. 637.) Dr. Khader found that Perkins' range of motion in her right shoulder was decreased on induction and internal rotation with some pain around the right upper trapezius region. (Tr. 638.) Dr. Khader gave Perkins a cortisone injection. (Tr. 638.) Dr. Khader diagnosed Perkins with cervical degenerative joint disease, possible cervical radiculitis, and right trapezius pain. (Tr. 638.) During a follow-up visit on July 21, 2009, Perkins reported some improvement following her injection, but she continued to have some discomfort. (Tr. 636.)

An MRI of Perkins' right knee on July 15, 2009 showed that Perkins had a complex radial tear of the posterior horn and body of the lateral meniscus. (Tr. 654.) On September 17,

2009, an MRI of Perkins cervical spine showed discogenic and facet degenerative changes were present from C3-C4 through C6-C7 and that central canal stenosis appears most significant at C5-C6. Neural foranial stenosis appears most significant at C6-C7 on the left. (Tr. 641-42.)

On September 3, 2009, Perkins visited Dr. Hossfeld with complaints of pain in her neck, right shoulder, and right knee, depression, and possible bladder infection. (Tr. 620.) Dr. Hossfeld determined that Perkins had a urinary tract infection, spinal stenosis in cervical region, general osteoarthritis, depressive disorder, and vaginitis and vulvovaginitis. (Tr. 622.)

Between September 4, 2009, and April 7, 2011, Dr. Khader treated Perkins for complaints of neck and right scapular region pain. (Tr. 625-633.) Dr. Khader diagnosed Perkins with cervical degenerative joint disease, myofascial pain, cervical strain, trapezius/rhomboid strain, and possible right C5-C6 radiculitis. (Tr. 625-631.) Treatment consisted of trigger point cortisone injections and home exercise. (Tr. 625-628, 630.)

## IV.    Standard of Review

The court reviews the ALJ's decision to determine whether the factual findings are supported by substantial evidence. 42 U.S.C.A. § 405(g). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find adequate support for the ALJ's decision. *Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994).* Therefore, even if this court finds that there is a preponderance of evidence against the weight of the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion. *Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

1. The findings of credibility made by the ALJ;

2. The education, background, work history, and age of the claimant;

3. The medical evidence given by the claimant's treating physicians';

4. The subjective complaints of pain and description of the claimant's physical activity and impairment;

5. The corroboration by third parties of the claimant's physical impairment;

6. The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and

7. The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

## V.    Discussion

Perkins alleges three errors for review.  First, she asserts that the ALJ erred in failing to fully and fairly develop the arguments both for and against granting benefits.  Second, she contends that the ALJ failed to properly consider opinion evidence.  Third, she argues that the ALJ failed to properly consider pain.

The Court will address the issue of opinion evidence first, because it is dispositive. Generally, a treating physician's opinion is given controlling weight, but is not inherently entitled to it.  *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).  A treating physician's opinion will be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

evidence in the case record.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation."  *Prosch v. Apfel,* 201 F.3d 1010, 1013 (8th Cir. 2000).  "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if [the conclusions] are inconsistent with the record as a whole."  *Id.*

RFC is defined as what the claimant can do despite his or her limitations, and includes an assessment of physical abilities and mental impairments.  20 C.F.R. §§ 404.1545(a), 416.945(a).  The RFC is a function-by-function assessment of an individual's ability to do work related activities on a regular and continuing basis.[1]  SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own descriptions of his limitations.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).  Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question.  *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional.  *See Lauer*, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC).  An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record.  *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

---

[1]A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.  SSR 96-8p, 1996 WL 374184, at *1.

In this case, the ALJ gave nominal weight to the Physical RFC Questionnaire opinion of Dr. Hossfeld, Perkins' treating physician.  (Tr. 372-373.)   The ALJ noted Dr. Hossfeld's consistent diagnosis of Perkins' condition, Perkins' consistent complaints of pain, and the consistency with some of the other medical evidence in the record.  (Tr. 373.)  The ALJ found, however, that Dr. Hossfeld's findings that were consistent with the other physicians' findings were "isolated in nature."  (Tr. 373.)  Next, the ALJ found that the RFC completed by W. Hughes was entitled to no weight as the person's credentials were not listed; therefore, it appeared that W. Hughes was not an acceptable medical source.  (Tr. 374.)  Then, the ALJ gave nominal weight to the Psychiatric Review Technique completed by Dr. McGhee, because it was completed before records regarding Perkins' mental health care treatment were submitted.  (Tr. 373-74.)   Based on the foregoing, there is no medical evidence in the record, treating or consulting, that examines Perkins' ability to function in the workplace with her impairments. Therefore, the Court finds the ALJ's decision is not supported by substantial evidence, because there is no medical evidence in the record that provides an assessment of Perkins' residual functional capacity.

It is true that "[a] disability claimant has the burden to establish her RFC."  *Masterson v. Barnhart*, 363 F.3d 731, 737-38 (8th Cir. 2004).  However, the ALJ has an independent duty to develop the record despite the claimant's burden.  *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).  "Some medical evidence must support the determination of the claimant's RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  "[T]he ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'"  *Id.*  (quoting *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2003)).

In some cases, the duty to develop the record requires the ALJ to obtain additional medical evidence, such as a consultative examination of the claimant, before rendering a decision. *See* 20 C.F.R. §§ 404.1519a(b), 416.945a(b). "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011). Therefore, "[a]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995).

In this case, the undersigned finds that the ALJ had a duty to further develop the record to obtain medical evidence to assist in the determination of the RFC in this matter. Because the ALJ afforded nominal or no weight to all of the medical evidence that addressed Perkins' functional abilities in the workplace, the ALJ should have obtained additional medical evidence to assist in the determination of Perkins' RFC. Therefore, the the ALJ's decision be reversed and remanded for a consultative examination.

## VI. Conclusion

Based on the foregoing, the Court finds that the Commissioner's decision should be reversed and remanded.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner denying Claimant's application for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Social Security Act is **REVERSED**.

**IT IS FURTHER ORDERED** that this case is **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Order pursuant to sentence four of § 405(g).

**IT IS FURTHER ORDERED** that the Clerk of Court shall substitute Carolyn W. Colvin for Michael J. Astrue in the court record of this case.

An appropriate judgment will accompany this Memorandum and Order.


_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**


Dated this ___30th___ day of September, 2013.